IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA )
)
v. )
) Criminal No. 3:12CR192–HEH
ALAN L. BUTLER, )
)
Defendant. )

## MEMORANDUM OPINION
(Government's Motion for Preliminary Order of Forfeiture)

The Defendant, Alan L. Butler ("Defendant" or "Butler"), entered a plea of guilty on January 16, 2013 to a single count indictment charging conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349. The indictment provided notice to the Defendant that upon conviction, he would be required to forfeit to the United States his interest in any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense of mail fraud. The case is presently before the Court on the Government's Motion for Preliminary Order of Forfeiture. The Government seeks a personal money judgment against the Defendant as provided under Federal Rule of Criminal Procedure 32.2(b)(1)(A). Both parties have submitted extensive memoranda of law supporting their respective positions. Clearly, the Government has the burden of proving the amount of forfeiture by a preponderance of the evidence. *United States v. Cherry*, 330 F.3d 658, 669–70 (4th Cir. 2003). This Court heard evidence and oral argument on May 14, 2013.[1]

---

[1] At the Defendant's sentencing hearing on May 9, 2013, the Court heard detailed evidence

While the Defendant entered a plea of guilty in this case without the benefit of a plea agreement, he did execute a statement of facts succinctly summarizing the essence of the offense to which he pled guilty. As part of his Rule 11 colloquy with the Court, the Defendant swore that the Statement of Facts offered by the Government was correct. Fed. R. Crim. P. 11(b)(3).

According to the stipulated statement of facts, Butler was employed as the Vice President and Director of Construction for CH Construction, LLC ("CHC") from in or about October 2002 until in or about August 2011. It further stated that "[a]s the Vice President and Director of Construction, Butler was responsible for managing CHC's development and construction projects, adhering to construction cost budgets, obtaining subcontractor bids and estimates, selecting and overseeing subcontractors." (Statement of Facts ¶ 2, ECF No. 19.) The statement of facts further disclosed that Butler and another individual, also employed by the owner of CHC, in 2004, formed Valley Construction, Corp. ("Valley"). In 2011, Butler formed another solely-owned business, ACT Resources and Remediation ("ACT"). In his capacity as Director of Construction for CHC, Butler fraudulently awarded subcontracts to Valley and ACT to perform certain construction work on CHC projects without advising the owner of CHC, Roger Glover, of his interest in Valley and ACT.

---

concerning labor allegedly performed by the Defendant at several job sites. The Defendant argued at that time that this labor should be considered a setoff against any restitution due to the victim corporation. For reasons more particularly set forth in open court, the Defendant's setoff theory was rejected. In essence, the Court found that the type of labor allegedly performed by the Defendant was within his general contractual duties that he owed the victim corporation. However, for the purpose of determining the amount of forfeiture appropriate in this case, the Court considered only directly relevant portions of the testimony offered on May 9, 2013.

2

Butler, after surreptitiously awarding contracts to Valley and ACT, would engage subcontractors to complete the work—again without the knowledge of others at CHC or Glover. Valley would pay the subcontractors directly for the cost of the work performed and bill CHC. According to the Statement of Facts, "Valley received more money from CHC for the work than it paid to the subcontractors." (Statement of Facts ¶ 8.) The Government maintains, and the evidence appeared to confirm, that Butler added a significant markup for the services performed by the subcontractors. During the seven year period in question, the Government contends that Butler's personal profit was $864,914.61. He contests this figure and claims that his alleged margin of profit—the alleged loss to CHC—should be entirely set off by approximately 1,900 hours of unbilled labor he performed during that period in furtherance of the Valley and ACT contracts. Butler submits that these services were over and above the fulfillment of his duties as Director of Construction for CHC. Consequently, he argues that he should receive credit for the value of his extracontractual services despite its fraudulent nature.

Both parties in this case appear to acknowledge that forfeiture is mandatory in cases involving convictions for conspiracy to commit mail fraud. *See* 18 U.S.C. § 981(a)(1)(c); 28 U.S.C. § 2461(c); *United States v. Monsanto*, 491 U.S. 600, 606 (1989). The parties also agree that this Court should employ the net, as opposed to gross, proceeds of the crime in calculating the forfeiture award. This appears to be consistent with the language of 18 U.S.C. § 981(a)(2)(B), wherein it prescribes that the net proceeds approach should be used in "cases involving lawful goods or lawful services that are sold or provided in an illegal manner." Despite some disagreement among federal courts as to

3

whether this subsection embraces mail and wire fraud, this Court, under the facts of the immediate case, finds it to be logical and appropriate. Given the agreement among the parties, the Court will only require forfeiture of the net proceeds realized by the Defendant.

Having determined the appropriate analytical framework, the Court will next turn to the more contentious question of what constitutes net proceeds. In calculating the amount of proceeds to be forfeited, 18 U.S.C. § 981(a)(2)(B) directs the Court to deduct from the amount derived from illegal activity any "direct costs incurred in providing the goods or services." The Government maintains that this encompasses direct out-of-pocket expenses, exclusive of overhead and taxes, and perhaps any documented materials purchased in fulfilling the subcontracts. The Defendant adopts a more expansive view that includes personal labor he performed. In support of his setoff claim, the Defendant draws the Court's attention to several cases discussing the entitlement, in very limited circumstances, to a reduction in the loss amount for the value of any property or collateral returned to the victim or of legitimate services rendered. *See United States v. Chatterji*, 46 F.3d 1336 (4th Cir. 1995); *United States v. Baum*, 974 F.2d 496 (4th Cir. 1992); *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991). The most prominent factual feature distinguishing these cases from the one at hand is the Defendant's job description as Director of Construction for CHC. The Defendant was clearly responsible for overseeing each construction project to which he was assigned. A reasonable

construction of those duties would include some sweeping, cleaning and site preparation.[2]

In *United States v. Baum*, the defendants pled guilty to making a false statement to a financial institution and to wire fraud in connection with their mortgage loan application. In reversing the trial court, the Fourth Circuit held that the loss amount must be reduced by the value of the security interest held by the financial institution. 974 F.2d at 498–99. *United States v. Chatterji* provides equally scant guidance. In *Chatterji*, the defendant pled guilty to conspiracy to defraud the United States and to obstructing proceedings before a federal agency, in connection with obtaining the Food and Drug Administration's approval of a generic drug. In rejecting the application of a sentencing enhancement for actual or intended losses to victims, the Fourth Circuit concluded that there was no actual or intended loss, because the drug was exactly what it purported to be and produced a specific benefit that the FDA requirements were intended to ensure. 46 F.3d at 1341–42.

A careful survey of forfeiture jurisprudence unfortunately yields a finite well of instructive authority on calculating net proceeds. Counsel direct the Court's attention to several cases discussing computation of loss for guideline purposes, *United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998) and *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1998), but neither touch specifically on the issue at hand. Both cases arguably support, in the abstract, the theory advanced by the Defendant that credit should be given

---

[2] Although Butler testified that he performed a wide variety of tasks in furtherance of the subcontracts awarded to Valley and ACT, another construction supervisor refuted this contention. Neil Sugarman, Vice President of Environmental Stone Work, who was regularly present at one of the job sites in question, testified that he never observed Butler perform any manual labor, site preparation or clean up.

5

for any legitimate services rendered to the victims in calculating losses. The determinative question, however, distills to whether the admittedly fraudulent services rendered by the Defendant, while lawful in nature, were legitimate or an integral part of the actus reus.

In both the Statement of Facts supporting his plea of guilty and his testimony at the sentencing hearing, the Defendant acknowledged that his "self-dealing" and concealment of his ownership in Valley and ACT were elements of the underlying scheme to defraud CHC. He also conceded that he had marked up the costs of the services actually provided by the subcontractors he used to perform the work he billed to CHC. The testimony of Special Agent David P. Hulser ("S.A. Hulser") of the FBI, a certified public accountant, also convinces the Court that the markup of subcontractor services was considerably higher than the prevailing market rate. S.A. Hulser, the lead investigator in this case, reached this conclusion from his analysis of the financial records of the corporations and those of other subcontractors.

Assuming for the sake of analysis that Butler actually performed manual labor, as he contends, it did not provide legitimate value to CHC. Aside from being part of his contractual duties, the services he allegedly provided, and for which he now seeks credit, were specifically performed with the intent to profit at his employer's expense. It was the very essence of the criminal conduct to which he pled guilty. *See United States v. Vinyard*, 266 F.3d 320, 331 (4th Cir. 2001). It is therefore not properly credited as a

setoff against losses in calculating restitution or forfeiture.[3] The Court will, however, without objection by the Government, credit against the loss amount the actual cost of services by outside contractors engaged by Valley and ACT and any documented costs of building materials supplied by Butler. The Court must next determine what, if any, out-of-pocket costs have been properly documented.

During the evidentiary hearing conducted on May 14, 2013, the Defendant produced a stack of several hundred documents purporting to be receipts for claimed out-of-pocket expenses, such as building materials. Without particularized explanation, the Defendant testified that the receipts collectively represented unreimbursed monies expended by him in furtherance of the Valley and ACT subcontracts. When offered into evidence, the Government objected on several grounds. First, the documents had not been produced in response to a grand jury subpoena specifically requesting this type of information. The subpoena was served on Defendant's counsel during the investigative stage of the case, over one year prior to the immediate evidentiary hearing.

Next, the Government pointed out that counsel for the Defendant had neither given notice nor displayed the mound of documents to the Government in advance of offering them into evidence. Prior to receiving the receipts into evidence, the Court recessed the proceedings to allow the Assistant United States Attorney and S.A. Hulser an opportunity to examine the documents. Although the prosecutor was later able to establish on cross-examination that several of the receipts were unrelated to the

---

[3] The same analysis applies with respect to the United States Sentencing Guidelines loss determination under § 2B1.1(b)(1)(H).

subcontracts at issue, he and the agent were unable to determine, on quick review, if the balance reflected case-related expenses. The Court finds itself in a similar posture. The supporting testimony offered by the Defendant fails to either describe the specific use of the materials or items reflected, or directly connect them to the Valley or ACT subcontracts billed to CHC. Offered in gross, and without further individualized explanation, the mound of several hundred receipts has minimal evidentiary value. Moreover, sifting through the documents as presented would require the Court to engage in an exercise of forensic auditing beyond its ken. The Defendant has simply failed to meet his burden of proof as to these alleged direct costs. *See* 18 U.S.C. § 981(a)(2)(B).

S.A. Hulser testified that based on his examination of the relevant financial records,[4] he determined that the total amount billed to CHC by Valley for work performed during the relevant time period was $1,531,264.68. Further review revealed that Valley's total disbursement to legitimate subcontractors was $707,302.70. This resulted in an overbilling of $823,961.98.

With respect to ACT, S.A. Hulser calculated the total invoices to CHC to be $109,561.42. ACT disbursements to subcontractors amounted to $68,608.79, leaving a delta of $40,952.63. Therefore, according to S.A. Hulser, the total amount overbilled was $864,914.61.

Based on the foregoing analysis, the Court finds that the Government is entitled to a money judgment in the amount of $864,914.61, which represents the net proceeds

---

[4] S.A. Hulser testified that he based his calculations on bank records for Valley at Wachovia Bank, account records for ACT at BB&T, along with the defendant's personal and corporate income tax returns.

fraudulently obtained by Butler.

As part of its Motion for Preliminary Order of Forfeiture, the United States seeks forfeiture of a number of traceable, identified assets, as well as several substitute assets. If the statutory requirements of 21 U.S.C. § 853(p) are met, forfeiture of substitute assets is mandatory. *United States v. Alamoudi*, 452 F.3d 310 (4th Cir. 2006). As the court pointed out in *Alamoudi*,

> Pursuant to § 853(p), a court "shall order the forfeiture of any other property of the defendant" if it finds that, "as a result of any act or omission of the defendant," the property subject to forfeiture under the statute "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty." 21 U.S.C.A. § 853(p)(2).

*Alamoudi*, 452 F.3d at 314.

At the May 14, 2013 evidentiary hearing, S.A. Hulser testified that proceeds of the fraudulent Valley and ACT subcontracts were directly traceable to several bank accounts and a 2006 GMC Yukon truck. He also testified that approximately $29,080.00 of the fraud proceeds were transferred from Valley Construction accounts into an individual retirement account with Sterling Capital Management, LLC, a subsidiary of BB&T. S.A. Hulser further indicated that on November 26, 2012, the day before Butler was originally scheduled to enter a plea of guilty, the funds from the IRA were withdrawn and deposited into a bank account in only his wife's name at the Raleigh County Federal Credit Union, Beckley, West Virginia, in an account ending in 4182. The Court finds that the funds deposited in this account are directly traceable to the proceeds of Butler's fraudulent

conduct. Under well-established law in the Fourth Circuit, the Government's interest vests in substitute assets "upon commission of the act giving rise to [the] forfeiture." *United States v. McHan*, 345 F.3d 262, 271 (4th Cir. 2003).

S.A. Hulser's testimony also demonstrated by a clear preponderance of the evidence that approximately $9,000.00 of the fraud proceeds were deposited in a BB&T account ending in 9006, and approximately $1,700.00 of those proceeds were placed in a BB&T account ending in 8442. Butler admitted ownership of these accounts, as well as the 2006 Yukon truck, to the United States probation officer as reflected in the Presentence Report in this case. The money in these accounts, as well as the Yukon truck, are therefore subject to forfeiture in satisfaction of the money judgment awarded in this case.[5]

Based on the foregoing, the Court will grant the Government's Motion for Preliminary Order of Forfeiture, order a money forfeiture in the amount of $864,914.61 and direct the Government to seize the below described property in partial satisfaction of the aforesaid judgment:

> All monies in Raleigh County Federal Credit Union, Beckley, West Virginia, account ending in 4182, in the name of Michelle Butler;
>
> All monies in BB&T account ending in 9006;
>
> All monies in BB&T account ending in 8442;

---

[5] With respect to other directly traceable assets, S.A. Hulser testified that his investigation revealed none. He did conclude that the majority of the fraud proceeds had either diminished in value, been commingled into personal accounts or been used to pay ordinary living expenses. S.A. Hulser supported his findings with corporate and personal bank records. The Government has clearly satisfied the requirements of 21 U.S.C. § 853(p).

2006 GMC Yukon with Vehicle Identification No. 1GKFK66U26J13888.

The Preliminary Order of Forfeiture will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Dated: May 24, 2013
Richmond, VA